**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**IMOGENE MURPHY,**

      **Plaintiff,**

**vs.**                              **Case No. 4:09cv186-RH/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D). It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

Plaintiff, Imogene Murphy, applied for disability insurance benefits. Her insured status for disability benefits will continue until December 31, 2010. Plaintiff alleges disability due to chronic obstructive pulmonary disorder (COPD), sleep apnea, and asthma, with onset on January 16, 2006. Plaintiff was 62 years old at the time of the

administrative hearing (on February 23, 2008), has an 11th grade education, and has

past relevant work as a hostess, manager, and cashier in a restaurant, a bank teller,

and a receptionist.  The Administrative Law Judge found that Plaintiff had the residual

functional capacity to do a limited range of light work, can still do her past relevant work

as a food service manager, assistant food manager, restaurant hostess, cashier II, retail

store manager, teller, and receptionist, and thus was not disabled.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.  Chester

v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a

scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable

person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler,

703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d

1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if

supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir.

2002).  "If the Commissioner's decision is supported by substantial evidence we must

affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232,

1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial

deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211

(11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to

uphold the Secretary's decision by referring only to those parts of the record which

support the ALJ.  A reviewing court must view the entire record and take account of

evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber

v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed

all evidence and has sufficiently explained the weight he has given to obviously

probative exhibits, to say that his decision is supported by substantial evidence

approaches an abdication of the court's 'duty to scrutinize the record as a whole to

determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662

F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do past relevant work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or
        equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past
        relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Medical evidence**[1]

Plaintiff has been treated by Diane Haisten, D.O., for primary care since

December 27, 2001.  R. 333.  On March 21, 2005, Plaintiff was admitted to the hospital

by Dr. Heisten.  R. 368.  She had severe bronchitis with bronchospasm.  R. 368.  She

---

[1] Descriptions of the purpose and effects of prescription drugs are from PHYSICIANS'
DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS
DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx.
Information about medical terms and prescription drugs also come from DORLAND'S
MEDICAL DICTIONARY FOR HEALTH CONSUMERS, available at:
http://www.mercksource.com (Medical Dictionary link).  Social Security Rulings can be
found at:  http://www.ssa.gov/OP_Home/rulings/rulfind1.html.  The pages at these
websites are not attached to this report and recommendation because the information is
relatively well-settled, the precise definitions are not at issue in this case, and the
definitions are not likely to be in dispute.

was given Prevacid for reflux, which helped, and her bronchospasm and cough resolved. *Id.* She was discharged in a stable condition, but, said Dr. Haisten, was not to work for a week. *Id.*

She was seen again by Dr. Haisten on May 4, 2005, with an acute asthma exacerbation. R. 324. Medications were prescribed. *Id.* She was still wheezing bilaterally on May 11, 2005. R. 323. She was seen again on August 30, 2005. R. 321. She had gone to the emergency room the day before due to dizziness. *Id.* Her lungs were found to be clear. *Id.*

Plaintiff was seen by Dr. Haisten on November 1, 2005, with a "terrible cough, congestion." R. 319. She was breathing better the next day, and was not wheezing. R. 318.

On December 2, 2005, Plaintiff was seen by J. Daniel Davis, M.D., at the Tallahassee Pulmonary Clinic. R. 338. Dr. Davis noted that Plaintiff had had pneumonia in April, 2005, experienced shortness of breath thereafter, and after testing, was found to have paralysis of the right hemi-diaphragm. *Id.* She had experienced intense pain in her shoulder contemporaneous with the onset of shortness of breath. *Id.* Plaintiff was then working as a bank teller. R. 339. Plaintiff's weight was 176 pounds. *Id.* Examination of her chest revealed "[d]ullness right lower lobe with decreased breath sounds." *Id.* Dr. Davis said that complex spirometry was conducted, and her FVC levels were 87%, 92%, and 86% of predicted results. R. 340. Dr. Davis's impression was paralyzed right hemi-diaphragm, chronic cough and dyspnea,[2] obesity, and

---

[2] Dyspnea is breathlessness or shortness of breath; difficult or labored respiration. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

possible sleep-disordered breathing. *Id.* He referred to this as a "difficult problem," and "remotely, if this persists beyond a year or two diaphragmatic plication[3] might be possibility." *Id.*

On December 22, 2005, Plaintiff had a brachial plexus MRI. R. 271. Dr. Davis noted that this scan showed "pronounced elevation of the right hemidiaphragm consistent with phrenic nerve paralysis." *Id.*

On January 10, 2006, Plaintiff returned to Dr. Davis. R. 336. She was having "intermittent dyspnea at work, worse at work, particularly when she bends over." *Id.* Her cough had improved. *Id.* Dr. Davis said that the MRI had shown no abnormality. *Id.* He noted decreased breath sounds of the right lung lobe. *Id.* He ordered complete pulmonary function testing and arterial blood gases. *Id.*

On January 16, 2006, Plaintiff saw Dr. Heisten. R. 316. Her oxygen saturation level was 99%, and 95% when she was walking. *Id.* Dr. Heisten wrote:

> [Patient] unable to continue work. She is so exhausted from schedules. She is able to accomplish her ADL [activities of daily living] without great difficulty.

R. 316.

On February 9, 2006, Plaintiff returned to Dr. Davis. R. 432. Her cough had largely resolved using Advair.[4] *Id.* Plaintiff complained of dypsnea with any exertion. *Id.* Dr. Davis said:

---

[3] Plication is the operation of taking tucks in a structure to shorten it. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[4] Both Advair HFA and Advair Diskus are used to treat asthma. PDRhealth™, PHYSICIANS DESKTOP REFERENCE .

> Repeat pulmonary function tests today are mildly reduced.  Diffusion capacity is 72% of predicted.  Lung volumes are normal and $FEV_1$ is 89% of predicted or 2 liters.  Her MVV is 102% of predicted.  Room air $PO_2$ is 73.

R. 432.  On examination, Dr. Davis found that her chest was "[w]ithout dullness to percussion, clear to auscultation with good bilateral breath sounds."  He concluded with this assessment:

> Dyspnea – clinically this is out of proportion to her physiologic abnormalities on PFT's [pulmonary function tests], it seems unlikely a paralyzed hemidiaphragm would create as much dyspnea as she has symptomatically.

R. 432.  A repeat CT chest scan was ordered.  R. 433.

On March 7, 2006, Dr. Haisten wrote a memorandum.  R. 480.[5]  She said that Plaintiff's "disability" was the result of a paralyzed diaphragm, not a collapsed lung.  *Id.* She said that the impairment was not a result of her bout with pneumonia in March, 2005.  *Id.*  Dr. Haisten said: "Ms. Murphy is completely disabled because we are unable to re-inflate her lung due to the paralysis of her diaphragm."  *Id.*

On March 14, 2006, Plaintiff saw Dr. Davis.  R. 430.  The CT scan showed her condition to be unchanged.  *Id.*  On examination, her breath was clear to auscultation with good bilateral breath sounds.  *Id.*  Dr. Davis's assessment that day was bronchitis, dyspnea – multifactorial, and paralyzed right hemi-diaphragm.  *Id.*  She was to return in three months.  R. 431.

---

[5] After the ALJ rendered his decision, Plaintiff submitted evidence to the Appeals Council which the Appeals Council made a part of the record.  R. 5-119.  This evidence is also found at R. 477-568.  Most of these medical records are copies already in the record.

On June 2, 2006, Plaintiff reported to Dr. Davis that she still had "intermittent dyspnea." R. 428. She had had a stress test but did not have the results. *Id.* Her lungs were found to be clear. *Id.* Dr. Davis said that Plaintiff had had exercise oximetry[6] and no oxygen desaturation was found. *Id.* He reported the results of spirometry testing. *Id.* He concluded that no action was indicated, "given normal spirometry." R. 429. A tentative return in six months was contemplated. *Id.*

On June 19, 2006, Plaintiff was examined by Shiva Mahinrad, M.D., for a disability evaluation. R. 302. On examination, Dr. Mahinrad found that Plaintiff had undiminished muscle strength bilaterally and her range of motion was normal, except for limitation to abduction and external or internal rotation of her right shoulder secondary to pain. *Id.* He found that she had diffuse decreased breath sounds mostly on the bases, but without crackles or rhonchi. *Id.* Her gait and tandem walking were normal. *Id.* A chest x-ray and a pulmonary function test were ordered. *Id.* A chest x-ray revealed a "significantly elevated hemidiaphragm," but her lungs were clear. R. 303. The results of the spirometric pulmonary function test appeared to be normal. R. 301.

On July 26, 2006, Plaintiff was examined by Augustine S. Lee, M.D., for a consultative evaluation of her right hemi-diaphragm paralysis and dyspnea. R. 283. Dr. Lee noted that "lung function tests have not shown any limitation." *Id.* He noted the elevation of her right hemi-diaphragm as shown on the x-ray, but with no obvious mass lesions. *Id.* He said that Plaintiff's clinical history "indicates dyspnea on exertion of

---

[6] Oximetry is the measurement of oxygen saturation of the blood using an oximeter. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

gradual onset over 2-3 years."  *Id.*  Plaintiff said that this had started at the time of a

severe episode of bronchitis.  *Id.*  Plaintiff reported to Dr. Lee:

> Now she has difficulty with household activities and she reports she
> cannot vacuum, for example.  Particularly hard in upper body activities.
> More recently, in addition to exertional dyspnea, she seems to fatigue and
> tire much more easily.

*Id.*  She had been doing exercise after work for 6-8 months.  *Id.*  This had become

increasingly difficult, and she stopped in November or December, 2005.  R. 283-284.  A

strong family history of asthma was noted, and she had been diagnosed as having

asthma "early this year."  R. 284.  Her sister and father had asthma, and her sister died

of asthma.  R. 285.  Plaintiff said that her asthma attacks were triggered by smells,

humidity, and smoke, and caused wheezing, shortness of breath, and a cough.  R. 284.

Nebulizers helped but made her jittery.  *Id.*  Plaintiff reported having suffered two bouts

of pneumonia in the last year, one of which required hospitalization.  *Id.*  She had never

had a pneumonia vaccine.  *Id.*  A pulmonary function test was normal.  *Id.*  Plaintiff said

she had purchased a hospital bed a year earlier, and slept upright.  *Id.*  She had

suffered significant sleep disturbance.  *Id.* and R. 286.

On examination, Dr. Lee found Plaintiff's lungs to be "[d]ull to percussion and

diminished air movement in the right base; otherwise, no wheezes, crackles or rubs

elicited."  R. 285.  He said that Plaintiff's asthma was recent onset and then doing well

with Advair and Albuterol.[7]  R. 286.

---

[7] Albuterol Sulfate is prescribed for bronchial spasms and used to treat asthma.
PDRhealth™, PHYSICIANS DESKTOP REFERENCE .

Dr. Lee noted that the referring physician felt that Plaintiff's shortness of breath was "disproportionate to the amount of ventilatory limitation noted on the pulmonary function tests (PFT)."  R. 286.  The pulmonary function tests had been normal.  *Id.*  He thought that weight loss, sleeping in a more upright position, and diaphragmatic plication might help.  *Id.*  Dr. Lee thought that Plaintiff's diaphragmatic paralysis was probably idiopathic and probably viral in origin.  *Id.*  Dr. Lee thought that Plaintiff's pain in the arm and shoulder was possibly Parsonage-Turner syndrome.[8]  Dr. Lee recommended another complete pulmonary function test and a cardiopulmonary exercise test.  *Id.*  Dr. Lee also ordered a CT chest scan to rule out mass lesion as a cause of her right hemi-diaphragm paralysis and overnight oximetry followed by a sleep medicine consultation.  R. 287.

On July 27, 2006, Plaintiff had a cardiopulmonary stress test.  R. 281.  The exercise last 8 minutes 7 seconds and was terminated at that point due to shortness of breath.  *Id.*  It was noted:  "The aerobic capacity for exercise is normal, however, there is evidence of ventilatory inefficiency near peak exercise consistent with history of diaphragmatic dysfunction."  R. 282.

On July 27, 2006, Plaintiff had a CT scan of her chest.  R. 280.  She had "elevation of the right hemidiaphragm with associated ateledectasis in the right lung base."  *Id.*  Small noncalcified pulmonary nodules were observed in the lower lungs that

---

[8] Parsonage Turner syndrome, or brachial plexopathy, is pain, decreased movement, or decreased sensation in the arm and shoulder due to a nerve problem.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

might be metastatic disease or noncalsified granulomas. *Id.* These were unchanged from the study on February 13, 2006. *Id.*

On August 22, 2006, Plaintiff had a "sleep consult" performed by Siong-Chi Lin, M.D. R. 276. The purpose was to assess Plaintiff's sleep disturbance and disordered breathing during sleep. *Id.* Dr. Lin noted that on July 26, 2006, an overnight oximetry showed two stretches of disordered breathing, and Plaintiff only slept for two hours out of eight hours in bed. *Id.* He thought that "this number of desaturations in a short period of time could be significant." *Id.* Dr. Lin's impression was chronic psychologic insomnia, restless leg syndrome, obstructive sleep apnea, major depression, untreated, and a history of panic disorder. R. 277.

Plaintiff had another sleep study on August 28, 2006, with CPAP.[9] R. 409. She was found to have mild to moderate obstructive sleep apnea. *Id.* She felt that she slept better with a combination of CPAP and Ambien. *Id.* Christopher Nolte, M.D., determined from this study that Plaintiff's "overall degree of sleep disordered breathing is mild." R. 411. He said that if she were willing to try CPAP, "a pressure of 5 cm is all that she needs. Otherwise, the emphasis will be on weight reduction." *Id.*

Plaintiff returned to Dr. Lee on September 15, 2006. R. 405. Plaintiff reported "a nice response to CPAP therapy," waking up "feeling more refreshed." *Id.* Plaintiff said that it was typical in that season for her to get increased postnasal drainage and

---

[9] People with obstructive sleep apnea, particularly those who have excessive daytime sleepiness, benefit most predictably from continuous positive airway pressure (CPAP). With CPAP, people breathe through a face or nose mask that provides a slightly higher pressure in the airway. This increased pressure props the throat open as the person breathes in. CPAP can be given with or without humidifying the delivered air. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

coughing. *Id.* She was using Advair and Albuterol. *Id.* Dr. Lee said that since her paralyzed hemi-diaphragm was idiopathic, he could only speculate as to whether it was caused by a virus or was Parsonage-Turner syndrome. *Id.* He said that her limitations had been confirmed by lung function measurements, but the limitation was not enough to consider a diaphragmatic plication. *Id.* He recommended improving her asthma, sleep apnea, and weight and thought that this would cause a "tremendous improvement." *Id.* Plaintiff reported success at weight loss. *Id.* Dr. Lee recommended that she continue her exercise program. *Id.*

Plaintiff saw Dr. Davis again on January 9, 2007. R. 426. She had lost 19 pounds with no associated dieting, and was 155 pounds. *Id.* He said that she had had an abnormal sleep study, but he did not have the records. *Id.* His diagnosis was paralyzed diaphragm, hemoptysis,[10] and irritable airways. *Id.* He ordered that she proceed with fiberoptic bronchoscopy. R. 427.

On January 16, 2007, Plaintiff underwent fiberoptic bronchoscopy by J. D. Davis, M.D. R. 245. The right lower lob of the right lung was abnormal, with "significant distortion at the level of the superior segment in the right middle lobe bronchus." *Id.* It looked like "a simple mechanical distortion." R. 246. A copy was sent to Dr. Haisten. *Id.* The cytology report found no malignant cells. R. 249.

On July 17, 2007, Dr. Davis noted the results of the bronchoscopy, finding the results to be negative. R. 423. He noted a CT scan consistent with a paralyzed right hemi-diaphragm. *Id.* By this time he appears to have obtained a copy of the sleep

---

[10] Hemoptysis is  the expectoration of blood or of blood-stained sputum.   DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

study and found that it showed "moderate obstructive sleep apnea." *Id.* Plaintiff reported dyspnea when lying on her right side and "mild dyspnea on exertion as well." *Id.* Her chest was clear to auscultation with good bilateral breath sounds. *Id.* His diagnosis was paralyzed right hemi-diaphragm, dyspnea secondary to the paralyzed right hemi-diaphragm, and mild obstructive sleep apnea. *Id.* She was tentatively to return in six months. R. 424.

On July 27, 2007, Dr. Haisten completed a "Physical Capacity Evaluation Checklist" form. R. 259. She expressed the opinion that in a normal workday, Plaintiff cannot stand, walk, or sit for more than 2 hours. *Id.* She felt that Plaintiff could occasionally lift up to 10 pounds. *Id.* Dr. Haisten wrote: "Pt. Has difficulty with physical activity do [sic] to breathlessness." *Id.* She said that these limitations had existed since January 16, 2006. R. 260. She said that Plaintiff could not lift 5 pounds repeatedly. R. 261. She also said, however, in contradiction to the above, that Plaintiff could sit for up to 6 hours in an 8 hour day, could stand for up to 2 hours in an 8 hour day, and could walk short distances, but said that Plaintiff could not be expected to attend any employment on an 8 hour day, 5 days a week, basis. *Id.* She wrote: "Pt has paralyzed R hemidiaphragm." *Id.*

On August 1, 2007, Plaintiff underwent overnight oximetry with CPAP. R. 457. Plaintiff was desaturated below 89% oxygen at one point for nearly 10 minutes. *Id.* She had 2 desaturation events (a drop of saturation of more than 4%) over 3 minutes and 7 less than 3 minutes. *Id.* The lowest desaturation event dropped to 79% and lasted 8 seconds. R. 458. Plaintiff spent 95% of the time at a saturation level of 93% and

above. R. 459. There is a handwritten note that appears to be by Diane Schlick (initials "S") that orders another test with CPAP and increased oxygen. R. 457.

On August 7, 2007, Diane Schlick, M.D.,[11] prescribed oxygen for Plaintiff via a CPAP mask. R. 463. The prescription was for one month. *Id.* The start date was July 31, 2007. *Id.*

On August 10, 2007, Plaintiff underwent another overnight oximetry. R. 444. The recording time was 4 hours 30 minutes. *Id.* The report stated: "There was no time spent with a saturation less than 89." *Id.* There were no desaturation events (drop of saturation of 4 or more) that exceeded 3 minutes, and there were 2 desaturation events of less than 3 minutes. *Id.* The two desaturation events was a drop from 100 to 93 and a drop of 98 to 91. R. 445. Plaintiff's oxygen saturation level was above 90% 99.5% of the time, and was mostly between 99% and 96%. R. 446, 447.

Another nighttime oximetry was conducted on August 11, 2007, between 9:15 pm and 3:22 a.m. R. 450. This time, there were no desaturation events at all. *Id.* Again, Plaintiff's saturation levels were primarily in the range between 99% to 97%, in the 96 to 95% range only 12% of the time, and never below 93%. R. 451.

On September 7, 2007, Plaintiff underwent an "oxygen conserving device assessment." R. 441. The testing conditions varied the use of "continuous flow" versus "conserving device." *Id.* It also varied between oxygen flows, from "24m" to "34m." *Id.* Plaintiff maintained "adequate saturation" (97-98%) at the higher oxygen level, but dropped to 88% with activity using the conserving device at 24m. *Id.*

---

[11] Defendant represents that Dr. Haisten changed her name to Schlick at some point. Doc. 18, p. 2, n. 1.

On January 7, 2008, Plaintiff returned to Dr. Davis. R. 560. She was using CPAP for her moderate sleep apnea. *Id.* Dr. Davis noted that she was "on oxygen during the day and at its marked limitation of exercise tolerance [sic]." *Id.* He noted that her previous pulmonary function test performed in February, 2006, showed only "mild extrinsic restriction." *Id.* He noted that Plaintiff had had an extensive workup at the Mayo Clinic. *Id.* He found that she had been stable without any new problems. *Id.* On examination he found her respirations not labored, but with decreased breath sounds in the right lower lobe. R. 561. Dr. Davis "strongly encouraged regular exercise on a daily basis." *Id.*

**Evidence from the administrative hearing**

Plaintiff testified that she was 5' 2" tall and weighed 145 pounds. R. 594. Plaintiff said that she last worked as a bank teller on January 13, 2006. R. 595. She quit work due to breathing problems. R. 596. She said that she could not tolerate the smell of the perfume and flowers, and had asthma attacks every day. *Id.* Prior to that, she worked as a teller for a credit union for three or four years. R. 596. The jobs, she said, required a lot of standing. R. 595-597.

Plaintiff said that her main problem involves breathing due to a collapsed lung. R. 602. She said she just did not "have enough air to do anything." *Id.* She said she also had asthma and sleep apnea. *Id.*

Plaintiff testified that sitting for a couple of hours made her "real miserable." R. 604. She said that after sitting for 30 or 40 minutes, she has to move around. *Id.* She said she could stand for a couple of hours, but has "real difficulty walking" due to

shortness of breath. *Id*. She said that bending over is uncomfortable because "it really cuts off my air." R. 605.

Plaintiff testified said that she could wash dishes, but she could not do the dishes all at one time. R. 606. She is able to put in a load of laundry, but her husband has to fold the laundry because she cannot use her upper body for that task. *Id*. She said she can cook some, with help from her husband, but cannot cook when using supplemental oxygen. *Id*. She does not do any vacuuming or dusting at all, and her husband does that work. *Id*. She reads and watches television news. *Id*. She does not go out to eat, attend church, and can no longer sew because the lint brought on asthma attacks. R. 607. She does not garden, engage in social activities, go to movies, and hardly ever goes out. *Id*. She can drive a motor vehicle, but not for long distances. R. 608. She is able to care for her personal hygiene. *Id*.

Plaintiff testified that she started in a restaurant as a waitress, then become a hostess. R. 611. She then had duties added and became an assistant manager, but continued to work as a hostess. R. 611-612.

Dr. Edward L. Griffin was called as a medical expert by the Administrative Law Judge. R. 577. Dr. Griffin based his review on the medical record, and did not examine or treat Plaintiff. R. 577-578. He is certified in internal medicine. R. 578.

Dr. Griffin noted from the records that Plaintiff had "a paralyzed right hemi-diaphragm that's been fully evaluated and no particular etiology can be found." R. 581. He said that this means that "the right side of the diaphragm doesn't pull the lung down

like it should." R. 592. Dr. Griffin did not think that this condition required the use of oxygen in the absence of lung disease. *Id.*

Dr. Griffin noted that in July, 2006, Plaintiff had a cardiopulmonary stress test Plaintiff "went eight minutes and seven seconds." R. 580. He said that was "pretty good, actually." R. 581.

Dr. Griffin discussed the results of two pulmonary function tests. R. 579. One test, said Dr. Griffin, "showed some COPD of moderate severity" and the other showed COPD of mild severity. R. 579-580. The latter was done in conjunction with the cardiopulmonary stress test. R. 579. Dr. Griffin did not think that there was a significant variation between the two tests. R. 580. He said that he thought that Plaintiff was not using supplemental oxygen when she took those tests because there was nothing in the record to say that she was on oxygen. R. 592-593. He explained that you "don't do PFTs on oxygen." R. 593.

Dr. Griffin discussed the sleep apnea testing in 2006 and again in 2007. R. 582. He noted that Plaintiff's oxygen saturation level did not go below 89% in 2007, and that meant that the CPAP was working. *Id.* He said that on the latter test, Plaintiff was provided supplemental oxygen as she slept. *Id.* Observing that Plaintiff's lowest oxygen desaturation percentage was 88%, Dr. Griffin thought that there was no clinical basis for prescribing oxygen. R. 582-583. He said: "I don't see justification for it [supplemental oxygen] during the day, with the lowest sat [saturation] of 88 percent." R. 583. He then said: "That [88%] is at the very edge of requiring oxygen, but, again, it [the CPAP and overnight study] was done on oxygen." R. 591. Dr. Griffin then said that

a desaturation rate of 88% without oxygen would be a proper threshold to prescribe

supplemental oxygen. *Id*. He said that:

> The difference between the average and low strikes me as being
> excessive. In other words, she's as good as 95 percent with oxygen on, I
> can't explain why her low would be 88.

R. 591. Dr. Griffin said that Plaintiff's sleep apnea was adequately treated with use of

CPAP. R. 582-583.

Dr. Griffin thought that Plaintiff could lift up to 25 pounds occasionally, and 10

pounds frequently. R. 585. He thought that Plaintiff's ability to stand, walk, sit, push,

pull, climb ramps and stairs, balance, kneel, crouch, crawl, reach overhead, gross

manipulation, and fingering were not affected at all. R. 587-588. She would be limited,

he thought, with respect to exposure to fumes, dust, chemicals, odors, and extreme

cold. R. 588.

The ALJ asked the vocational expert to consider a hypothetical person who could

lift and carry 20 pounds occasionally and 10 pounds frequently, could stand, walk, or sit

for six to eight hours, had limited ability to climb, had no problems with balancing,

kneeling, crouching, crawling, stooping, or manipulation, and had some environmental

limitations, especially involving temperature extremes and fumes. R. 614. The

vocational expert said that such a person could perform a substantial range of

sedentary and light work activity and could do all of Plaintiff's past relevant work. *Id*.

**Legal analysis**

### Whether the ALJ erred in failing to give substantial weight to the opinion of a treating physician

Plaintiff argues that the ALJ erred in failing to give substantial weight to the residual functional capacity assessment of Dr. Haisten, Plaintiff's treating physician. Doc. 12, p. 8. Plaintiff contends that this error was compounded by giving greater weight to the opinion of a non-examining consultant, Dr. Griffin.

The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). This is so because treating physicians:

> are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2). Important to the determination of whether there is a "detailed, longitudinal picture" of impairments is the length of the treatment relationship, the frequency of examination, the extent of the knowledge of the treating source as shown by the extent of examinations and testing, the evidence and explanation presented by the treating source to support his or her opinion, the consistency of the opinion with the record as a whole, and whether the treating source is a specialist with respect to the particular medical issues. 20 C.F.R. § 404.1527(d)(2)-(5).

A consultative examination, that is, a one-time examination by a physician who is not a treating physician, need not be given deference by the Commissioner. McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987); Kirby v. Astrue, 500 F.3d 705, 709 (8th

Cir. 2007) (a consulting physician's opinion "deserves no special weight"). The opinion of a consultative physician, however, is still a medical opinion deserving of consideration along with all of the other evidence. If the opinion of a consulting physician is consistent with other medical evidence, it is entitled to great weight. Moncrief v. Astrue, 300 Fed.Appx. 879, 881 (11th Cir. Dec 01, 2008) (not selected for publication in the Federal Reporter, No. 08-12853). To like effect is Giddings v. Astrue, 2009 WL 1813741 (2nd Cir. Jun 26, 2009) (not selected for publication in the Federal Reporter, No. 08-1108-CV):

> We recognize, of course, that Dr. Hargraves only examined Giddings once, and is not entitled to the deference of a treating physician. *See Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) ("With respect to 'the nature and severity of [a claimant's] impairment(s),' 20 C.F.R. § 404.1527(d)(2), the SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." (internal quotation marks omitted)). We also acknowledge that generally, "in evaluating a claimant's disability, a consulting physician's opinions or report should be given little weight." *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990). At the same time, ALJ Zolezzi did not refer to any medical opinion that contradicted the medical opinion of Dr. Hargraves as to Giddings's ability to sit, stand, or walk during the work day. *And we have indicated that, when a medical opinion stands uncontradicted, "[a] circumstantial critique by non-physicians, however thorough or responsible, must be overwhelmingly compelling in order to overcome" it. Burgess*, 537 F.3d at 129 (internal quotation marks omitted); *see McBrayer v. Sec. of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983) (stating that "t*he ALJ cannot arbitrarily substitute his own judgment for competent medical opinion*" and that "[w]hile an administrative law judge is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who testified before him" (citation and internal quotation marks omitted)); *see also Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004) (*per curiam*) ("Even if a treating physician's opinion is not entitled to controlling weight, [t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided" in the Commissioner's regulations.) (internal quotation marks omitted); *Lester v. Chater*, 81 F.3d

821, 830 (9th Cir. 1995) ("As is the case with the opinion of a treating
physician, the Commissioner must provide '*clear and convincing*' reasons
for rejecting the uncontradicted opinion of an examining physician.").

Giddings v. Astrue, 2009 WL 1813741, *2 (2nd Cir. Jun 26, 2009) (not selected for

publication in the Federal Reporter, No. 08-1108-CV) (emphasis added).

The opinion of a non-examining physician like Dr. Griffin is "entitled to little weight

and taken alone does not constitute substantial evidence to support an administrative

decision." Swindle v. Sullivan, 914 F.2d 222, 226 n.3 (11th Cir.1990), *citing*, Broughton

v. Heckler, 776 F.2d 960, 962 (11th Cir.1985). Nonetheless, assessments by non-

examining physicians may be considered by the ALJ as expert opinions. 20 C.F.R. §

416.927(f)(2)(i).

The reasons for giving little weight to the opinion of a treating physician must be

supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir.

1992), and must be clearly articulated. Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th

Cir. 2004). "The Secretary must specify what weight is given to a treating physician's

opinion and any reason for giving it no weight, and failure to do so is reversible error."

MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986). "Where the Secretary has

ignored *or* failed properly to refute a treating physician's testimony, we hold as a matter

of law that he has accepted it as true." *Id*. (emphasis added); Elam v. Railroad

Retirement Bd., 921 F.2d 1210, 1217 (11th Cir. 1991); Critchfield v. Astrue, 2009 WL

635698 (N.D. Fla. Mar 10, 2009) (No. 308cv32-RV/MD). *Compare*, Harris v. Astrue,

546 F.Supp.2d 1267 (N.D. Fla. 2008) (No. 5:07cv44-RS/EMT) (remanding because the

ALJ gave improper reasons to discount the opinion of a treating physician, but did not

ignore it).[12] *But see,* Cole v. Barnhart, 436 F.Supp.2d 1239 (N.D. Ala. 2006) (finding that the opinions of the treating physician must be accepted as true where the ALJ "did not properly refute them.").

This circuit finds good cause to afford less weight to the opinion of a treating physician "when the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240-1241(11th Cir. 2004); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991) ("The treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory."). *See also*, Crawford v. Commissioner Of Social Security, 363 F.3d 1155, 1159 (11th Cir. 2004) (finding good reasons articulated by the ALJ to discount the treating physician's opinion).

The Administrative Law Judge determined not to assign significant weight to the opinion of Dr. Haisten because it was:

> unsupported by the objective clinical findings and observations in the claimant's progress notes and is inconsistent with the diagnostic test results and other medical evidence of record. The assessment is also inconsistent with the claimant's presentation at the hearing.

R. 133. Prior to this, the ALJ had explained why he did not fully credit Plaintiff's testimony as to the extent of her impairments. R. 132. He had also thoroughly discussed the opinion of Dr. Griffin, and Dr. Griffin's discussion of the clinical evidence. *Id.*

---

[12] Harris distinguished MacGregor as a case where the ALJ made no finding as to the weight of the opinion of the ALJ, *i.e.*, he *ignored* the opinion. 786 F.Supp.2d at 1282.

The last reason for discounting Dr. Haisten's opinion, that it was inconsistent with Plaintiff's "presentation" at the hearing, is insufficient.  It is not appropriate for the Administrative Law Judge, who is not a medical expert, subjectively to arrive at an index of traits which he expects the claimant to manifest at the hearing, and then to deny the claim when such traits are not observed.  Freeman v. Schweiker, 681 F.2d 727, 731 (11th Cir. 1982).[13]

The first reason, however, is sufficient and supported by substantial evidence in the record which the ALJ had discussed in the immediately preceding passages of his opinion.  The most important is Dr. Griffin's discussion of the medical evidence.  The ALJ observed that Plaintiff's chronic obstructive pulmonary disorder was only mild, and she performed well on pulmonary function testing.  R. 132.  This reason for discounting Dr. Haisten's residual functional capacity opinion is supported by substantial evidence in the record.  On February 9, 2006, Dr. Davis referred to pulmonary function tests showing that Plaintiff's pulmonary function was only mildly reduced.  R. 432.  On July 26, 2006, Dr. Lee determined that "lung function tests have not shown any limitation" and were "normal."  R. 283-284.  Dr. Lee noted that the referring physician felt that Plaintiff's shortness of breath was "disproportionate to the amount of ventilatory

---

[13]  The Eleventh Circuit has termed this "sit and squirm jurisprudence," and has ruled that this method of analysis cannot be used.  McRoberts v. Bowen, 841 F.2d 1077, 1081 (11th Cir. 1988); Johns v. Bowen, 821 F.2d 551, 557 (11th Cir. 1987); Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984).  It is proper, however, for the ALJ to consider the claimant's demeanor and appearance during the hearing as long as this is not in lieu of consideration of the medical evidence presented.  Norris v. Heckler, 760 F.2d 1154, 1158 (11th Cir. 1985); Macia v. Bowen, 829 F.2d 1009, 1011 (11th Cir. 1987).  "We do not accept an ALJ's mere reliance on his observation of a claimant during a hearing as the only basis upon which to reject a claimant's reference to pain."  Norris, 760 F.2d at 1158.

limitation noted on the pulmonary function tests (PFT)." R. 286. On July 27, 2006, a cardiopulmonary exercise stress test produced normal aerobic capacity, but with "ventilatory inefficiency near peak exercise consistent with history of diaphragmatic dysfunction." R. 282. On June 2, 2006, Dr. Davis found that Plaintiff had only "intermittent dyspnea," had exercise oximetry and no oxygen desaturation was found, and spirometry testing was normal. R. 428, 429.

As further noted by the ALJ, Dr. Griffin also said that the record showed that Plaintiff's sleep disorder was being successfully treated. R. 132. This is supported by substantial evidence in the record. On August 28, 2006, Plaintiff was found to have mild to moderate obstructive sleep apnea, R. 409, and a reviewing physician, Dr. Nolte, felt that this condition was mild. R. 411. On September 15, 2006, Plaintiff reported to Dr. Lee that she had good response to CPAP therapy. R. 405. In August, 2007, in two other nighttime oximetry studies, Plaintiff had essentially no desaturation events, apparently using CPAP and supplemental oxygen. R. 444-451.

Other medical evidence supports the ALJ's determination that Dr. Haisten's opinion should not be given substantial weight. Physicians often found on examination that Plaintiff's breathing was clear, that she had good bilateral breath sounds, or that her breathing was not labored. R. 432, 431, 428, 561. Several physicians recommended that Plaintiff regularly exercise. In September, 2006, Dr. Lee recommended that she continue her exercise program. R. 405. On January 7, 2008, even though Plaintiff had been prescribed supplemental oxygen, Dr. Davis "strongly encouraged regular exercise on a daily basis." R. 561. *Id.* It is reasonable to infer that these physicians did not think

that Plaintiff had a significantly debilitating breathing impairment and that, indeed, her breathing might improve with exercise. Finally, Dr. Haisten did not make any clinical observations about the effect of Plaintiff's lung impairment upon her residual functional capacity. In summary, the reasons given by the ALJ for rejecting Dr. Haisten's residual functional capacity assessment correctly followed the law and are supported by substantial evidence in the record.

### Whether the ALJ erred in finding Plaintiff's description of her impairments not credible to the degree alleged

The ALJ determined that Plaintiff's testimony, describing her impairments, was not credible. Plaintiff contends that the ALJ's conclusion was legally and factually insufficient. Doc. 12, p. 11.

Pain and other symptoms reasonably attributed to a medically determinable impairment are relevant evidence for determining residual functional capacity. Social Security Ruling 96-8p, p. 4. Pain and other symptoms may affect either exertional or non-exertional capacity, or both. *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain. *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so. *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true. *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002). The reasons articulated for disregarding the claimant's subjective testimony as to symptoms must be based upon substantial evidence. Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991). It is not necessary that the ALJ expressly identify this circuit's pain standard if his findings "leave no doubt as to the appropriate result" under the law. Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

The ALJ determined that Plaintiff's testimony as to the limiting effects of her breathing problems was not credible. R. 131-132. While he pointed to evidence of daily activities, he also said: "More significantly, the medical evidence of record simply does not substantiate the claimant's allegations of disabling limitations." R. 132. He then discussed the testimony from Dr. Griffin, who reviewed the objective medical evidence. *Id*. That evidence has been fully addressed above. Plaintiff plainly has an underlying medical condition that causes breathing problems, but the objective medical evidence does not confirm that she cannot do the sedentary jobs identified by the vocational expert. Since the rejection of Dr. Haisten's opinion was legally sound and supported by substantial evidence in the record, it was not error to rely upon Dr. Griffin's analysis of the medical records. Dr. Griffin's testimony, standing alone, was an adequate basis for discounting Plaintiff's testimony.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge were based upon substantial evidence in the record and correctly followed the law. The

decision of the Commissioner to deny Plaintiff's application for benefits should be affirmed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on February 8, 2010.


s/      William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

Case No. 4:09cv186-RH/WCS